UNITED STATES of America, Appellant,

v.

Orlando GONZALEZ, Defendant–
Appellee.

No. 1307, Docket 90–1704.

United States Court of Appeals,
Second Circuit.

Argued May 3, 1991.

Decided Sept. 23, 1991.

Alan M. Vinegrad, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, of counsel), for appellant.

Marjorie M. Smith, New York City (Dianne Renwick, The Legal Aid Soc., Federal Defender Services Unit, of counsel), for defendant-appellee.

Before OAKES, Chief Judge, WINTER, Circuit Judge, and MUKASEY,* District Judge.

OAKES, Chief Judge:

The United States of America appeals from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* sentencing Orlando Gonzalez to 33 months' imprisonment for importing cocaine into the United States in violation of 21 U.S.C. § 952(a), a sentence that represented one-third of the minimum term prescribed by the Sentencing Guidelines. We affirm.

At sentencing, the court found that Gonzalez had a "feminine cast to his face and a softness of features which will make him prey to the long-term criminals with whom he will be associated in prison." Relying on our decision in *United States v. Lara,*

* The Honorable Michael B. Mukasey, United States District Judge of the Southern District of    New York, sitting by designation.

905 F.2d 599 (2d Cir.1990), which held that "extreme vulnerability of a criminal defendant is a proper ground for departure," *id.* at 603, the court concluded that a downward departure was appropriate to ensure Gonzalez's safety, and therefore reduced Gonzalez's sentence to one-third of the normally applicable minimum term.

The Government challenges the district court's decision to depart downward on four grounds: (1) that Gonzalez's overall appearance and demeanor were not so unusual as to warrant a downward departure; (2) that there was no evidence that Gonzalez "was bisexual, or possessed any other sexual orientation that might make him unusually vulnerable to physical abuse in prison;" (3) that there was no evidence that Gonzalez had been attacked while he was in custody awaiting trial and sentencing; and (4) that prison conditions are not an appropriate basis for downward departure. In the alternative, the Government argues that the extent of the court's downward departure was excessive.

## I

■ A district court is authorized to impose a sentence below the normally applicable Guidelines range if it "finds that there exists a[] ... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). Here, reviewing the district court's factual determinations under the clearly erroneous standard, *see Lara,* 905 F.2d at 603,[1] we conclude that the downward departure was proper.

■ As to the Government's first challenge, we believe that the court's conclusion that Gonzalez's overall appearance and demeanor made him unusually vulnerable was not clearly erroneous. Specifically, Judge Weinstein noted that Gonzalez was extremely small and feminine looking, and that, although he was nineteen, he had the

appearance of a fourteen or fifteen year old boy. Under *Lara,* these factors are sufficient to establish that Gonzalez was unusually susceptible to prison abuse. *See id.*

The cases the Government cites to the contrary are inapposite. In *United States v. Apple,* 915 F.2d 899 (4th Cir.1990), the court held only that a refusal to depart downward was not reviewable on appeal. *See id.* at 912. The fact that the defendant in *Apple* based his claim for downward departure on a physical condition, therefore, was immaterial to the court's holding and has no bearing on the present case. In *United States v. Pozzy,* 902 F.2d 133 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990), the court was concerned not with an unusually child-like or feminine young man, but rather with a pregnant woman, and it specifically rested its decision on the fact that pregnant women are neither "atypical nor unusual" in the federal penal system. *See id.* at 138–39. Because Gonzalez was not a pregnant woman, *Pozzy* is inapposite.

The Government's second argument—that Gonzalez's situation was different from that of the defendant in *Lara* because Gonzalez is neither gay nor bisexual—is entirely without merit. Harassment of individuals on the basis of sexual orientation is not directed only at persons who are gay or bisexual; rather, homophobic attacks are often based on the perpetrator's mistaken perception that a heterosexual individual is in fact gay. *Cf. Developments in the Law—Sexual Orientation and the Law,* 102 Harv.L.Rev. 1508, 1541 n. 151 (1989) (noting that the National Gay and Lesbian Task Force has defined "anti-gay" violence as violence "directed against persons or their property because ... they are lesbian or gay *or perceived to be so* ") (emphasis added). Thus, even if Gonzalez is not gay or bisexual, his physical appearance, insofar as it departs from traditional notions of an acceptable masculine demeanor, may make him as susceptible to homo-

---

**1.** The Government correctly notes that, in *Lara,* we reviewed *de novo* the district court's determination that extreme vulnerability was not adequately considered by the Sentencing Commission. *See* 905 F.2d at 602. However, the question here is not the *legal* question whether extreme vulnerability is a proper basis for depar-

ture (that question, after all, has already been settled in this Circuit by virtue of *Lara* ), but rather the *factual* question whether the facts upon which the district court relied sufficiently establish that Gonzalez was extremely vulnerable. As to that question, the clearly erroneous standard applies. *See id.* at 603.

phobic attacks as was the bisexual defendant before us in *Lara*.

With regard to the Government's third claim, we believe it would be absurd to interpret *Lara* as requiring a defendant to have already been victimized as a prerequisite to departing downward under the Sentencing Guidelines. After all, does it not make more sense to allow judges to prevent violence before it occurs, rather than requiring them to wait until the damage has already been done?

Finally, the Government's contention that prison conditions do not present an adequate basis for downward departure is precluded by our holding in *Lara*, which was based in large part on the recognition that prison conditions may be particularly oppressive to vulnerable individuals.

## II

■ The Government argues that, even if the initial decision to depart downward were permissible, the court need only have lowered Gonzalez's sentence to 95 months in order to ensure that he would be placed in a "level one" (*i.e.*, minimum security) facility, and that any departure below 96 months was therefore excessive. We disagree.

To be sure, once the court had ensured that Gonzalez would be placed in a level one facility, the risk to Gonzalez's safety was considerably reduced. However, the court could reasonably have concluded that, even in a minimum security facility, the risk of assault could not entirely be eliminated. For example, under procedures applied by the Bureau of Prisons, prisoners serving lengthy sentences—even for violent crimes—are automatically considered for placement in minimum security facilities after a period of eight years. Under this system, then, even a level one facility will have its share of potentially assaultive inmates who have been transferred near the end of their terms. Because the risk of assault is present even in a level one facility, the court acted within its discretion in reducing Gonzalez's sentence below 96 months.

It might be suggested that, if the court believed that placement in a level one facility would still subject Gonzalez to some risk

of harm, the most logical solution would be to impose no jail time at all. Given that the Guidelines would probably not permit such a result, however, it could be argued that the court had no choice but to confine Gonzalez to the level one facility for the maximum time allowable. In our view, however, the fact that the Guidelines preclude what might be the most logical way to ensure Gonzalez's safety—*i.e.*, a sentence of no jail time—does not mean that the court must then impose what is undoubtedly the most *il*logical of all results—placement in the level one facility for the full 95 months. Rather, it seems to us that by choosing a shorter period of incarceration, and thereby diminishing the likelihood that Gonzalez would be assaulted, the court sensibly balanced Gonzalez's need for safety against the Government's interest in incarcerating wrongdoers.

Accordingly, the judgment of the district court is affirmed.

WINTER, Circuit Judge, dissenting:

I respectfully dissent.

I do not agree with my colleagues that *United States v. Lara*, 905 F.2d 599 (2d Cir.1990), held that a downward departure may be based on the vulnerability of a prisoner to physical assault. *Lara* involved a prisoner with an immature and fragile appearance and a bisexual orientation who, during his presentence incarceration, had been threatened with being forced to become a male prostitute. Prison officials determined that the only way to protect Lara was to place him in solitary confinement—in "the hole." *Id.* at 601. The *Lara* opinion thus stated:

> Although we agree [that the Commission considered the propensity of criminal defendants to physical attack in prison when it formulated the Guidelines], it is plain that the Commission did not consider vulnerability to the extent revealed in this record—where the only means for prison officials to protect [the prisoner] was to place him in solitary confinement.

*Id.* at 602. It further stated:

> [T]he district court obviously believed it had such an extraordinary situation be-

cause of the defendant's particular vulnerability due to his immature appearance, sexual orientation and fragility. The severity of [defendant's] prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates. We agree with the district court that this presents an extraordinary situation that warrants considering factors 'ordinarily' irrelevant.

*Lara* held that, although the Commission considered the vulnerability of prisoners to physical assault, it had not considered circumstances in which the only means of protecting a prisoner vulnerable to homosexual or physical assault was solitary confinement. In such a case, the exacerbation of the circumstances of the prisoner's confinement by placing him in "the hole" justifies a reduction in the length of confinement. *Lara* thus holds no more than that a shorter period in solitary confinement is the punishment equivalent of a longer term in the prison population.

In the instant matter, the prisoner is neither bisexual nor homosexual, does not have a record of being assaulted, and is not going to be placed in solitary confinement. Of course, assaults or even the daily fear of assault take their toll, and a humane judge might well consider this in sentencing a prisoner under a legal regime that allows sentencing judges discretion to take into account the broad range of matters thought by the judge to be relevant to a particular sentence. We do not operate under such a legal regime, however. Instead, we operate under the reign of the Sentencing Guidelines, and sentencing judges may depart from those Guidelines only when "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988).

*Lara* held that the Commission *did* consider the vulnerability of prisoners to physical assault in formulating the Guidelines. *Lara*, 905 F.2d at 603. If the Commission took vulnerability to physical assault into account, its consideration would have begun with the most vulnerable prisoners and worked back from there. There is no evidence that the Commission irrationally ignored the most vulnerable prisoners and considered the plight only of prisoners generally able to protect themselves but still vulnerable to random assault. There is thus no legal basis for a downward departure in the instant case.

This result may be inhumane, but I see no alternative in the face of the two legislative decisions to the contrary—one by the Commission in codifying the Guidelines, the other by the Congress in accepting them. The creation of the Guidelines regime reflected a decision that the justice in greater uniformity—or perceived uniformity—in sentencing outweighs the justice that flows from highly individualized sentencing. The particular Guidelines adopted reflect a judgment that the pre-Guidelines regime was not sufficiently punitive. One may quarrel with both judgments, but we lack the power to subvert them, a result I fear the present decision achieves.

The subversion of the Guidelines' goal of uniformity is aggravated by the fact that the ground for a downward departure relied upon by my colleagues lacks contour. Any defendant under average height seems eligible. Whether a prisoner succeeds in appearing vulnerable is an entirely subjective judgment by the district judge, with the result that wide disparities in sentences will result, depending largely upon whether a defendant is before a sympathetic or unsympathetic judge.[1]

Moreover, the reasons for the downward departure to 33 months are unclear. The district judge stated on the record that he

---

**1.** Beyond the brief subjective observations of the district judge, the record contains little but Gonzalez's height and weight, 5'2", 110 lbs., not specifically relied upon by my colleagues, and a couple of photographs that do not reveal a vulnerable appearance but do not exclude it either.

The district court found only that Gonzalez would be vulnerable to homosexual or nonsexual assaults. In contrast, my colleagues find as an adjudicative fact that Gonzalez may be subject to homophobic assaults. This finding, not supported by the record, is taken from an article in the *Harvard Law Review*.

wanted to ensure that Gonzalez would be placed in a minimum security facility. That could have been achieved by a sentence of 96 months, a one-month downward departure. Complete protection from physical assault in prison could have been achieved by a sentence of no jail time. Shortening the sentence to 33 months thus neither protects Gonzalez from assault nor effectuates the Commission's view as to appropriate sentences for narcotics offenders. The reduced sentence thus seems to have no logical basis. If Gonzalez is assaulted on numerous occasions during his 33-month sentence, then his sentence will have been inhumanely long. Given the perceived importance of Gonzalez's age and size, a 33-month sentence appears to incarcerate him during the period of his greatest vulnerability. If Gonzalez is not assaulted, he may grow a bit and look considerably older as his 33-month term comes to an end. In that case, Gonzalez will serve a sentence that is about one-third or less of what is served by prisoners who have committed the same crime.

Of course, as I noted above, continuous fear of assaults will exacerbate the circumstances of a prisoner's sentence and that may have been a factor in the district court's decision. However humane that consideration may be, I cannot say that the Commission did not take this factor into account. Moreover, the degree of apprehension about physical assault suffered by a prisoner will be the result of a manifold of intangible factors. It is entirely subjective and not necessarily related to age, size or appearance. The number of defendants eligible for a downward departure on that ground is thus virtually unlimited, and the Guidelines' goal of uniformity will be thoroughly subverted.